**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Miscellaneous Case No. 21-mc-00164-RM

DONNA CURLING, DONNA PRICE, and JEFFREY SCHONBERG,

      Petitioners,

v.

DOMINION VOTING SYSTEMS, INC.,

      Respondent.

---

**RESPONSE TO MOTION TO COMPEL DISCOVERY FROM NON-PARTY
DOMINION VOTING SYSTEMS, INC.**

---

Respondent Dominion Voting Systems, Inc. ("Respondent"), by and through its undersigned counsel, Brownstein Hyatt Farber Schreck, LLP, hereby files its Response to Petitioners' Motion to Compel Discovery from Non-Party Dominion Voting Systems, Inc. (the "Motion"), and states as follows.

## I.    INTRODUCTION

Petitioners' attempt to compel Respondent to respond to extensive, unduly burdensome, and expensive third-party discovery at the eleventh hour must be denied. Petitioners opened this matter to enforce a subpoena containing 17 requests for production of documents against Respondent,[1] a non-party to the underlying litigation in the Northern District of Georgia entitled *Curling v. Raffensperger*, No. 1:17-cv-2989-AT (N.D. Ga.) ("*Curling*"). Rather than obtain the

---

[1] Petitioners' Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action to Dominion Voting Systems, Inc. (the "Subpoena") is attached as Exhibit 2 to the Motion.

requested discovery from any of the *Curling* defendants, who have objected to many of the same requests, Petitioners are trying to weaponize Rule 45 and have Respondent do their work for them. Petitioners further requested an expedited briefing schedule and days for Respondent to respond to the Subpoena but failed to provide notice of the Court's Minute Order to Respondent that set forth the briefing schedule. The Federal Rules of Civil Procedure do not permit such unreasonable actions.

Making matters worse, Petitioners are among the growing list of litigants seeking discovery against Respondent related to the voting systems it provided for the 2020 election. Petitioners assert that their lawsuit is distinct from and unaffiliated with the tsunami of 2020 election fraud lawsuits—almost all of which have been quickly dismissed[2]—because they are not trying to overturn the election results. But they, like the plaintiffs in many of the 2020 election fraud lawsuits, allege that their fundamental right to vote has been denied because of alleged vulnerabilities in the voting systems used in various jurisdictions. The plaintiffs in these lawsuits—ignoring the extensive legitimate post-election audits, including thousands of hand-count audits and recounts (including the hand-count audit and machine recount in Georgia), that have conclusively confirmed the accuracy of Respondent's machines' tallies in the 2020 election—often seek from Respondent similarly burdensome discovery and request sensitive business information and trade secrets, regardless of whether Respondent is a party.

Not only do these election lawsuits without any justification sow greater distrust in the validity of elections, but they have almost uniformly been dismissed for lack of standing.

---

[2] Recently, Judge Neureiter dismissed a similar lawsuit against Dominion and other defendants—*O'Rourke v. Dominion Voting Sys. Inc*., 20-CV-03747-NRN, 2021 WL 1662742 (D. Colo. Apr. 28, 2021)—and subsequently sanctioned the lawyers.

*Curling* should be no exception.  In the aftermath of the Eleventh Circuit's decision in *Wood v. Raffensperger*, 981 F.3d 1307 (11th Cir. 2020), which affirmed the dismissal of similar claims because they were generalized grievances against the government and thus failed to meet the elements of Article III standing, the court in *Curling* has ordered briefing on the threshold standing issue.  Respondent, a non-party, should not be compelled to respond to extensive and burdensome discovery requests when subject matter jurisdiction has yet to have been resolved.  The alternative is untenable: Respondent would be inundated with subpoenas every election cycle irrespective of whether the plaintiffs have standing to assert their claims or whether Respondent is a named party—and in complete disregard of the state-approved procedures for auditing election results.

On the eve of a discovery deadline, Petitioners demand this discovery from Respondent on an expedited schedule, despite that their case has been pending for several years, that they have previously obtained discovery from Respondent, that they now seek extensive discovery of Respondent's highly sensitive and proprietary business information that will unduly burden Respondent and cause it considerable expense, and that it remains highly unlikely that they even have standing in the underlying case.  Given these important considerations, the Motion should be denied and the Subpoena quashed.

## II.     NATURE OF UNDERLYING CASE

Petitioners overlook several key aspects of *Curling* that are relevant to the Motion.  Principally, *Curling* is an election case brought by three voters from the State of Georgia against Georgia's Secretary of State, Georgia's Election Board Members, and members of Fulton County's Board of Registration and Elections.  Rather than engage in the legislative process or

lobby to alter the Secretary of State's election procedures, Petitioners brought a lawsuit hoping that a judge will order Georgia to alter its voting systems under the premise that the state's electronic voting system impeded their fundamental right to vote. Since Petitioners first brought the lawsuit, the State of Georgia changed its voting system statewide, to create a fully auditable paper ballot system. Petitioners, in response, changed course to criticize some aspects of that system, even though that system creates a paper ballot for every single vote cast. Petitioners want a return to purely paper-based voting, with no electronic component to the ballot casting process whatsoever. They have an agenda.

Although Respondent provided Georgia voting systems for the 2020 election, it is not a defendant in *Curling*. States and counties administer elections. Respondent is a government contractor that provided voting systems used in Georgia for the 2020 election. It does not decide which voting systems Georgia uses or otherwise play any role in Georgia's decisions regarding how to administer elections on Election Day. Petitioners' dispute is therefore with the defendants in *Curling*, not Respondent. And yet, despite all of this, Petitioners want extensive discovery from Respondent, much of which it could obtain directly from the defendants in *Curling* or through an open records request to the relevant custodians with the State of Georgia. The Motion is therefore an improper attempt by Petitioners to obtain discovery without resolving its pending discovery disputes with the defendants in *Curling* and unduly burden Respondent in the process. Indeed, Petitioners are demanding that Respondent produce documents before the close of discovery in roughly one week. *See* Mot., Ex. 5, at 6 (Amended Scheduling Order).

### III.     LEGAL STANDARD

"In determining whether to grant a motion to compel non-party production under Rule 45, courts 'consider the burden on the nonparty, relevance, the requesting party's need for the documents, the breadth of the document request, and the time period covered by the request.'" *Al Muderis v. Hernandez*, 1:20-MC-00090-RM, 2021 WL 119348, at *2 (D. Colo. Jan. 13, 2021) (quoting *Premier Election Sols., Inc.*, 2009 WL 3075597, at *3 (citation omitted)). While the federal rules permit discovery of non-parties by subpoena, non-parties have a different set of expectations when it comes to what is permitted discovery. "It is generally recognized that a non-party involuntarily embroiled in civil litigation should not be subjected to undue burden or significant expense merely by virtue of having received a subpoena." *W. Convenience Stores, Inc. v. Suncor Energy (U.S.A.) Inc.*, 11-CV-01611-MSK-CBS, 2014 WL 1257762, at *21 (D. Colo. Mar. 27, 2014). "A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena" and "[t]he court for the district where compliance is required must enforce this duty." Fed. R. Civ. P. 45(d)(1).  Courts will not permit a plaintiff to engage in a "fishing expedition" in the hopes of supporting his claim.  *See McGee v. Hayes*, 43 F. App'x 214, 217 (10th Cir. 2002).

A subpoena served on a non-party under Rule 45 of the Federal Rules of Civil Procedure is subject to the same standards in Rule 26(b)(1)—"it must seek relevant information and be proportional to the needs of the case." *Infinity Home Collection v. Coleman*, No. 17-MC-00200-MSK-MEH, 2018 WL 1733262, at *2 (D. Colo. Apr. 10, 2018).  However, "[t]he court may also consider the fact that the discovery sought is directed at a nonparty, and in such a case, the ordinary burden imposed under Rule 26 is generally greater." *Charles Schwab & Co. v.*

*Highwater Wealth Mgmt., LLC*, No. 17-CV-00803-CMA-NYW, 2017 WL 4278494, at *3 (D. Colo. Sept. 27, 2017) (citing *Echostar Commc'ns Corp. v. News Corp.*, 180 F.R.D. 391, 394 (D. Colo. 1998)). "The fact that discovery is sought from a non-party is one factor which the Court may weigh in determining whether [a party] is entitled to an order which requires the production of the materials or information." *Echostar*, 180 F.R.D. at 394 (citing *Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993)). Thus, "[c]ourts are required to balance the need for discovery against the burden imposed when parties are ordered to produce information or materials, and the status of a person or entity as a non-party is a factor which weighs against disclosure." *Spacecon Specialty Contractors, LLC v. Bensinger*, No. 09-CV-02080-REB-KLM, 2010 WL 3927783, at *3 (D. Colo. Oct. 1, 2010) (internal citations omitted).

## IV.   ARGUMENT

Against this backdrop, Petitioners' 17 requests for production of documents to a non-party are more than a mere inconvenience. As demonstrated below, the requests are unduly burdensome and exceedingly expensive, and request irrelevant documents and some of Respondent's most sensitive business information. Moreover, when Petitioners' requests actually ask for relevant documents, most of the corresponding responsive documents are in the possession—and sometimes solely in the possession—of the *Curling* defendants and the State of Georgia. These 17 requests were not carefully drafted to avoid burdening Respondent. Instead, they are part of a fishing expedition exhibiting Petitioners' ignorance of voting systems and disregard for Respondent.[3]

---

[3] Petitioners argue that Respondent's lack of specificity in its objections amount to a waiver. Not so; Respondent's objections to the subpoena were specific and track its arguments in this Response. *See* Mot., Ex. 3. Moreover, not only do Petitioners fail to cite to any controlling precedent, but they overlook that this Response is Petitioner's first filing with this Court, and that less specificity is demanded of non-parties.

### A. Several of Petitioners' Requests Fall Outside the Scope of Permissible Discovery under Rule 45.

The scope of discovery under Rule 45 of the Federal Rules of Civil Procedure is limited; courts have a duty to "closely regulate[]" non-party discovery. *Echostar*, 180 F.R.D. at 396. Rule 45 permits a party to serve a subpoena that commands a nonparty to "produce documents, electronically stored information [ESI], or tangible things." Fed. R. Civ. P. 45(a)(1)(C); *see also* Fed. R. Civ. P. 45(a)(1)(A) (specifying that non-party discovery is limited to information "in that person's possession, custody, or control"). In contrast, Rule 45 does not permit discovery requiring a nonparty to create new documents or tangible things not already in existence or within a nonparty's control. *See Georgacarakos v. Wiley*, No. 07-cv-1712, 2009 WL 924434, at *2 (D. Colo. Apr. 3, 2009) (reasoning that a subpoenaed person has no obligation to produce documents that do not exist); *see also* Fed. R. Civ. P. 34 (pertaining to production of documents that already exist). Therefore, a non-party should not be required to produce documents and related items that were not already created at the time of the request or are not within its control.

In Request No. 1, Petitioners request: "A complete forensic image of one D-Suite EMS server, including all hard disk storage of all server and client computers and network-attached storage devices, configured in the same way that Dominion configured the EMS server most recently used in, or if different currently in use in, Fulton County, Georgia." In other words, Petitioners want Respondent to request from Fulton County and the State of Georgia access to its EMS server, which Respondent does not have unilateral access to, copy a new forensic image of this server that does not already exist, and produce the forensic image within a week or so. *See* **Ex. A**, Decl. of Nicole Nollette, ¶ 7. Not only is this request overly burdensome in what it requires and the time frame for compliance, but it falls outside permitted discovery under Rule

45. Petitioners should have requested this information from the State of Georgia or Fulton County, in addition to trying to obtain it from the defendants in *Curling*.[4]

Relatedly, Request No. 7 asks for "[a] copy of any software compatible with Dominion BMDs and scanners used in Georgia that does not use bar codes or QR codes for vote tabulation, together with any necessary documentation, installation tools, and passwords or security keys." As Petitioners are undoubtedly aware by now, this request seeks a copy of software that Respondent is currently developing and may not eventually provide to Georgia. *See* **Ex. A**, ¶ 8. This software has not been certified. *Id.* Therefore, this request is premature, as it asks for intellectual property that is not finalized and only may be eventually utilized.

### B. Petitioners Can Obtain Most of the Documents They Seek from the *Curling* Defendants or Through Open Records Requests.

Although there is no absolute rule prohibiting a party from seeking to obtain the same documents from a non-party as can be obtained from a party, and there can be good reasons in specific cases for permitting such discovery, "[c]ourts may refuse discovery requests aimed at nonparties in cases where the same testimony or documents could instead be obtained from a party to the action." *Al Muderis*, 2021 WL 119348, at *2 (quoting *Landry v. Swire Oilfield Servs., L.L.C.*, 323 F.R.D. 360, 397 (D.N.M. 2018).[5]

---

[4] This Request seeks documents in this request that are the subject of a pending discovery dispute between the parties in *Curling*. *See*, *e.g.*, Mot., Ex. 6.
[5] Rule 26 of the Federal Rules of Civil Procedure also states that "the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C). Similarly, Rule 45 states "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1).

Here, documents and information sought in numerous requests can be obtained from a party or another source with more connection to the litigation and at less burden. In addition to Request No. 1, several other requests ask for documents that are in the possession of, and thus may be obtained from, the *Curling* defendants in that litigation or from the State of Georgia and its counties through open records requests. For example, Request No. 2 specifically asks for "procedures drafted or provided by the Office of the Secretary of State of Georgia," a defendant in *Curling*, as well as other documents that are public records. Other requests that fall within this category are: (i) Request No. 3,[6] which asks for copies of electronic information used to extract software or firmware on Election System equipment used in Georgia[7]; (ii) Request No. 4, which requests a copy of installation media for the D-Suite EMS currently deployed in Georgia;[8] (iii) Request No. 5, which asks for a copy of the installation files for the software update installed in 2020 on ballot marking devices in Georgia; (iv) Request No. 6, which requests a copy of all software updates for Election System equipment made available in Georgia, including to the Secretary of State's office, and is something provided to the state, which then provides them to the counties; (v) Request No. 14, which asks for procedures, mechanisms, practices, steps, and policies to protect the integrity and security of Election Projects in Georgia; and (vi) Request Nos. 8-13 and 15-17, which request, in part, communications between Respondent, the Georgia Secretary of State, and other defendants in *Curling* that can clearly be obtained through open records requests. *See* **Ex. A**, ¶¶ 9–11.

---

[6] Request Nos. 3 through 7 also seek documents that are the subject of a pending discovery dispute between the parties in *Curling*. *See*, *e.g.*, Mot., Ex. 6.
[7] The information sought in this request is useless unless Petitioners have obtained Election System equipment.
[8] The requested electronically stored information would not be helpful without the entire installation procedure, which demonstrates again that Petitioners do not know what they are asking for.

The fact that this information is available from other sources, such as party opponents, should not come as a surprise.  States and counties run elections, not Respondent.  Indeed, Petitioners do not deny in the Motion that they are seeking the very same information from these other sources.  The reason Petitioners issued the Subpoena appears to be that they are in discovery disputes with these parties and thus are using the Subpoena as a work-around to obtain discovery before the discovery deadline.  *See* Mot., Ex. 6 (Joint Discovery Statement).  To the extent Petitioners argue that they must seek this discovery from Respondent because the *Curling* defendants have cited contractual obligations in denying requested discovery, Respondent would be happy to consider a request to consent to certain discovery served on the *Curling* defendants, but that is very different from making Respondent itself, rather than the *Curling* defendants, responsible for the production.  Of course, any such request for consent would also depend on the resolution of other aspects of the current discovery disputes between Petitioners and the *Curling* defendants.

Respondent therefore should not have to comply with these requests until the *Curling* parties first resolve their discovery disputes.  If Petitioners truly need this third-party discovery after these disputes are resolved, then this issue may be revisited.  But Rule 45 should not be a loophole allowing Petitioners a second bite at the apple in lieu of resolving discovery disputes with opposing parties.

### C. Petitioners Seek Documents and Communications that Are Irrelevant and Not Proportional to the Needs of the Case.

In the Motion, Petitioners argue that they are seeking information unique to Respondent and thus it is not true that all of the requested information is available from other sources.  While it is true that Respondent's internal communications, for example, are not in the possession of

the *Curling* defendants, the documents and communications Petitioners seek that is not available from other sources is irrelevant, not proportional to the needs of the case, or both.

Petitioners specifically argue that Request Nos. 2, 3, and 8 through 17 are not available from other sources. However, as noted above, information requested in Request Nos. 2 and 3 is available from the *Curling* defendants and other public sources. To the extent that Petitioners are seeking in Request No. 2 "documentation of procedures" for using Respondent's equipment and software drafted or revised by or sent to or from Respondent that is not available from these other sources, Respondent is willing to produce them if it is provided a reasonable time to determine what responsive documents would truly not be available from these other sources, and to collect them. *See* **Ex. A**, ¶ 2 (explaining that Respondent estimates that it would take approximately two weeks to identify, review, and produce any such documents). Request No. 3 is different because it asks for highly sensitive and proprietary information that nevertheless is in the possession of the *Curling* defendants or the State of Georgia.[9]  *See id.*, ¶ 12.c

Request Nos. 8 through 17, in turn, principally ask for internal communications and communications with a broad and sometimes vaguely defined number of parties, including the *Curling* defendants, regarding a wide variety of topics.[10]  Respondent is unclear how its communications are relevant to Petitioners' claims in *Curling*. Petitioners have never specifically explained why they need this extensive discovery, such as Respondent's billing

---

[9] Similarly, as described above, Request No. 7 asks for intellectual property that is not in a final form and thus may not end up being utilized in Georgia. *See id.*, ¶ 8. Therefore, this request seeks speculative and irrelevant information.

[10] A large number of responsive communications to these requests are likely privileged and confidential attorney-client communications. In addition, Request No. 15, and potentially others, seeks communication specifically concerning this litigation. Respondent is not aware of any authority that would permit discovery of such communications that post-date the filing of the operative complaint.

records and its communications regarding anticipated changes to the Election System. Indeed, the Motion only speaks in generalities and conclusory statements that the discovery Petitioners seek is relevant. Courts have routinely held that "it is a generally accepted rule that standards for non-party discovery require a stronger showing of relevance than for party discovery." *See, e.g.*, *Pinehaven Plantation Prop., LLC v. Mountcastle Family LLC*, No. 1:12-CV-62, 2013 WL 6734117 (M.D. Ga. Dec. 19, 2013). Petitioners have not met their burden of showing why these requests seek relevant information and instead appear to be on a fishing expedition at Respondent's expense.

In addition to questionable relevance, Request Nos. 8 through 17 are not proportional to the needs of the case. This is self-evident from even a cursory review of these *ten* requests. Through these requests, Petitioners are seeking communications on a wide variety of topics regarding just about everything related to Respondent's voting systems used in Georgia and potentially around the country, regardless of the number of custodians involved and without defining the "third parties." *See* **Ex. A**, ¶¶ 14, 16. The breadth and depth of these requests more than demonstrate that Petitioners did not "take reasonable steps to avoid imposing undue burden or expense" on Respondent. Respondent should not have to do Petitioners' discovery for them, especially since Respondent is not even a party to the litigation.

### D. Numerous Requests Seek Proprietary Information and Trade Secrets.

As Petitioners note in the Motion, Requests Nos. 1, 2, 4, 5, 6, 7, and 14 ask for Respondent's highly sensitive propriety information and trade secrets. This includes proprietary software and other intellectual property, including software that is in the production phase, that would be devastating to Respondent's business should it be disclosed to competitors. Under

Rule 45, courts "may quash or modify a subpoena that requires 'disclosing a trade secret or other confidential research, development, or commercial information.'" *Schell v. Amendia, Inc*., No. 21-MC-00090-PAB-STV, 2021 WL 1541712, at *3 (D. Colo. Apr. 20, 2021) (quoting Fed. R. Civ. P. 45(d)(3)(A), (B)). Although the court issued a protective order in *Curling*, (*see* Mot., Ex. 4), Respondent has concerns that Petitioners will abide by it.

### E. Petitioners' Requests Are Unduly Burdensome and Vague.

Nevertheless, if Respondent were required to comply with the subpoena, the requests would subject Respondent to undue burden. Petitioners did not carefully draft the requests and instead drafted ***17 of them***, often using vague and confusing language.

A large percentage of these requests would take a considerable amount of time and expense to gather and then produce responsive documents. The principal examples are Request Nos. 8 through 17, which request an exorbitant amount of internal and external communications. These requests would require Respondent to gather communications from the over 60 relevant custodians, run search terms agreed upon with Petitioners after receiving clarity from Petitioners regarding what they actually seek,[11] review the communications for relevancy and privilege, and then produce them. *See* **Ex. A**, ¶¶ 15–17. Most of the requests also lack a relevant time limitation. The scope of this project thus is immense. While Respondent cannot give a more precise estimate of time and expense given that it had less than two weeks to respond to the

---

[11] Respondent does not understand what exactly Petitioners are requesting in the requests for communications. For example, Request No. 8 asks for "execution or operational issues or challenges," which is a subjective determination. Likewise, Request No. 13 requests "communications, contracts, billing records, and project records relating to Your role in the process of planning, creating, and distributing Election Projects for use in the state of Georgia during 2020 and 2021." This is a broad topic. If Petitioners could explain what they actually seek, then Respondent might be able to comply.

Motion, it anticipates that it would take at least five to six weeks and cost over $45,000, plus attorneys' fees and lost opportunity to comply with the Subpoena.  *See id.*, ¶ 18.

This burden is exacerbated by the abbreviated time frame to respond requested by Petitioners.  Petitioners served the Subpoena on June 9, 2021.  Although Respondent provided its responses and objections to the Subpoena on June 22, 2021, Petitioners waited until July 14th, 2021 to file the Motion and then failed to serve Respondent.  In the Motion, Petitioners request that Respondent produce all of the documents by July 28, 2021—a mere two weeks later—in order to meet the discovery cut-off in approximately a week from the date of this filing.  In other words, complying with the Subpoena by the discovery deadline would require Respondent to severely curtail operations and devote significant resources in a likely futile effort.  *See* **Ex. A**, ¶ 18.  Respondent will be unable to comply with Petitioners' onerous requests prior to the underlying discovery cut-off.  *Id.*, ¶ 19.

### F. Petitioners' Request No. 10 Appears to Derive from an Improper Motive.

In Request No. 10, Petitioners improperly request documents and communications "pertaining to vulnerabilities, security concerns, security risks, hacks, or compromises relating to [Respondent's] equipment of the type used in Georgia elections, including any such vulnerabilities, security concerns, or security risks that have come to light in connection with reviews of [Respondent's] products used in Antrim County, Michigan and Maricopa County, Arizona."  As this Court is undoubtedly aware, election conspiracy theorists have directed their attention to Antrim County and Maricopa County, and these counties have been subject to frivolous lawsuits and partisan (and improperly conducted) sham "audits."  It appears that by making this request, Petitioners are attempting to legitimize the extremely partisan Senate

sham "audit" in Maricopa County, which has been harshly criticized, and the sham "audit" in Antrim County that Petitioners' own expert thoroughly debunked.  This further begs the question of whether Petitioners are planning their own sham "audit" in Fulton County or elsewhere in Georgia and are using the Subpoena to begin the fishing expedition.

### G. Request No. 11 Demonstrates Petitioners' Lack of Understanding.

Again echoing debunked cries from election conspiracists, Petitioners ask in Request No. 11 for Respondent's communications, including those with contractors,[12] reflecting whether its equipment used in Georgia has ever been connected to the internet or an external network. Outside interference in the 2020 election is a myth that has been thoroughly debunked. Respondent's equipment is not configured or certified to be connected to the internet or an external network, and thus this request demonstrates a misunderstanding of the implementation of Respondent's equipment.  *See* **Ex. A**, ¶ 13.  That Petitioners even ask for such information casts doubt on the true intent of the Subpoena.

### H. Petitioners' Likely Lack of Standing is a Relevant Factor.

In light of the above, the Petitioners' highly questionable standing to even bring the *Curling* lawsuit is an important and relevant factor.  Although the Court in *Curling* has not stayed discovery while the parties continue to brief whether Petitioners have standing, (*see* Mot., Ex. 5), subject matter jurisdiction is a threshold issue that may warrant a stay.  "Questions of jurisdiction and immunity should be resolved at the earliest stages of litigation, so as to conserve the time and resources of the Court and the parties." *Edwards v. Zenimax Media, Inc.,* No. 12-cv-00411-WYD-KLM, 2012 WL 1801981, *1–2 (D. Colo. May 17, 2012); *see also Behrens v.*

---

[12] Respondent does not have any "Election Project programing contractors."  *See* **Ex. A**, ¶ 13.

*Pelletier*, 516 U.S. 299, 308 & 310 (1996) (noting that discovery can be particularly disruptive when a dispositive motion regarding immunity is pending); *Castro v. Holmberg*, No. 14-cv-00791-LTB-KMT, 2014 WL 4122175, *1 (D. Colo. Aug. 21, 2014) ("Courts have routinely recognized that discovery may be inappropriate where the court's jurisdiction is at issue").  At minimum, Petitioners' questionable standing further illustrates the improper burden imposed on Respondent as a non-party to comply with extremely expedited and broad discovery.

Specifically, two recent cases out of the Eleventh Circuit cast significant doubt on Petitioners' purported standing.  In the first case—*Wood v. Raffensperger*, 981 F.3d 1307 (11th Cir. 2020)—L. Lin Wood Jr., a Georgia voter, "sued state election officials to enjoin certification of the general election results, to secure a new recount under different rules, and to establish new rules for an upcoming runoff election" because Georgia's election procedures allegedly violated his federal constitutional rights.  The court held that plaintiff's injury of vote dilution based on his interest in compliance with election laws "is a 'paradigmatic generalized grievance that cannot support standing.'"  *Wood*, 981 F.3d at 1314–15 (quoting *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 356 (3d Cir. 2020), and noting that "[a]ll Americans, whether they voted in this election or whether they reside in Georgia, could be said to share Wood's interest in 'ensur[ing] that [a presidential election] is properly administered'").  Rather, "'no single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'"  *Id.* at 1314 (quoting *Bognet.*, 980 F.3d at 356).  As a result, "irregularities in the tabulation of election results do not affect [a plaintiff] differently from any other person" and thus do not confer standing.  *Id.* at 1315.

Similarly, in an unpublished opinion from three days ago, the Eleventh Circuit held that Mr. Wood's latest lawsuit, alleging that Georgia's runoff election was proceeding in a manner contrary to Georgia's election laws and the U.S. Constitution, also failed for lack of standing. *Wood v. Raffensperger*, No. 20-14813 (11th Cir. Aug. 6, 2021) (attached as **Ex. B**). Mr. Wood had alleged that the defendants authorized four unlawful procedures, including use of Respondent's voting machines, which, among other things, allegedly caused in-person votes to be valued less than absentee votes because of alleged vulnerabilities with the machines. **Ex. B**, at 2–3. The court nevertheless determined that these claims were generalized grievances, as Mr. Wood's asserted injuries were shared identically by Georgians who voted in person. *Id.*, at 6–7.

*Curling* is no different than the *Wood* decisions or the recent decision in *O'Rourke v. Dominion Voting Sys. Inc.*, 20-CV-03747-NRN, 2021 WL 1662742 (D. Colo. Apr. 28, 2021). Like the plaintiffs in those cases, Petitioners have alleged that Respondent's voting systems are unreliable and disadvantage in-person voters as compared to absentee voters in violation of the U.S. Constitution's protection of the fundamental right to vote. *See generally* **Ex. C** (Third Amended Complaint). Their claims concern the tabulation of votes—claims any other in-person voter in Georgia could make—and thus are generalized grievances that should be dismissed under controlling precedent.

### I. To the Extent Respondent Is Ordered to Comply, Costs Should Be Shifted to Petitioners.

Considering the undue burden, expedited time frame for compliance, and other factors explained above, Respondent respectfully requests that this Court protect Respondent from significant expense and shift costs to Petitioners should this Court order compliance with the Subpoena. *See Rhea v. Apache Corp.*, 833 F. App'x 186, 190 (10th Cir. 2020) (explaining that

under Rule 45(d)(2)(B)(ii), when a court orders compliance with a subpoena over a non-party's objection, the court must protect the non-party from significant expense resulting from compliance upon a showing by the non-party that they would incur significant expenses in responding to the subpoena); Fed. R. Civ. P. 45(d)(2)(B)(ii)) (requiring that when a non-party would be subjected to significant expense, the protection shifts as much of the compliance expense as necessary to the requestor to render the remaining expenses non-significant).

## V.    CONCLUSION

For the foregoing reasons, Respondent requests that this Court deny the Motion.

Dated: August 9, 2021

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By: s/ *Stanley L. Garnett*
   Stanley L. Garnett, Bar No. 12282
   Hubert A. Farbes, Bar No. 6353
   David B. Meschke, Bar No. 47728
   Amanda K. Houseal, Bar No. 49628

Attorneys for Respondent
Dominion Voting Systems, Inc.

CERTIFICATE OF SERVICE

      The undersigned hereby certifies that on this 9th day of August, 2021, I electronically filed a true and correct copy of the **RESPONSE TO MOTION TO COMPEL DISCOVERY FROM NON-PARTY DOMINION VOTING SYSTEMS, INC.** with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

                                          */s Stanley L. Garnett* _____

                                          Stanley L. Garnett