**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Misc. Case No. 21-mc-00164-RM

DONNA CURLING,
DONNA PRICE,
and JEFFERY SCHOENBERG,

       Plaintiffs,

   v.

DOMINION VOTING SYSTEMS, INC.,

       Defendant.

---

**REPLY IN SUPPORT OF MOTION TO COMPEL DISCOVERY FROM NON-PARTY**
**DOMINION VOTING SYSTEMS, INC.**

---

## INTRODUCTION

  For all Dominion's bluster in its Response, it has not met its burden to support its refusal to produce *anything* in response to Plaintiffs' June 9 Subpoena or offered any reason for refusing to confer on the substance of the Subpoena, including ignoring Plaintiffs' invitation to confer since filing this Motion. Dominion's refusal to comply or cooperate in any way needlessly compelled motion practice, wasting party and judicial resources.  Lacking any defense for its nonfeasance, it offers red herrings, inaccurate claims, and important omissions.

  Dominion's effort to liken Plaintiffs and their experts to frivolous election challengers and conspiracy theorists is highly misleading and offensive—and disingenuous.  Dominion omits that one of its own senior employees has retained—with Dominion's express approval— Plaintiffs' expert, Dr. J. Alex Halderman, as an expert witness for the employee's highly-

publicized defamation action against a raft of those same frivolous election challengers and conspiracy theorists. The Michigan Secretary of State also retained Dr. Halderman to analyze potential vote-altering failings involving Dominion voting equipment used in Antrim County, Michigan.[1] This is fundamentally similar to work he has performed for Plaintiffs in the *Curling* litigation with the same or similar Dominion voting equipment.[2] Unlike those pursuing meritless election challenges and sham "audits," which Dominion rightly denounces, Plaintiffs and their experts here rely on facts and science, *and are not challenging any election outcomes*. This is why they seek the discovery requested from Dominion—to pursue their claims on a record that includes critical information from the entity that manufactured and supports the voting equipment they are required to vote on in person in Georgia. Plaintiffs seek only to protect their constitutional right to vote at risk from extraordinary flaws in Dominion's voting equipment.

Dominion's contrary speculation regarding their motives is baseless and not well taken—

---

[1] Dr. Halderman concluded that the county's official presidential election results were accurate; the incorrect reporting of unofficial results in the presidential election was due to unintentional human error; the report claiming otherwise contained an extraordinary number of false, inaccurate or unsubstantiated statements; and *improvements in voting system software, design, training, and security were needed* to help users more easily identify when such human error occurs. *See* Michigan.gov, *Expert report affirms accuracy of Antrim County presidential election results* (Mar. 26, 2021), https://www.michigan.gov/som/0,4669,7-192-47796-555635--,00.html (including link to report). Dominion has repeatedly rebuffed Plaintiffs' and Dr. Halderman's *many* invitations to discuss with Dominion his findings regarding extremely serious vulnerabilities (which a voter could exploit in the voting booth in mere minutes to alter votes) during the last ten months—despite the recognition of Dr. Halderman's expertise and credibility regarding Dominion's own voting equipment per his engagement by one of its senior employees. This has left voters, and election outcomes, susceptible to those vulnerabilities.

[2] From the *Curling* court's order in October 2020, *e.g.*, "Dr. Halderman has also offered other core relevant testimony in this case in open and sealed hearings as well as in sworn declarations. He [and others of Plaintiffs' experts] have provided evidence *credibly* explaining how malware can mask itself when inserted in voting software systems or QR codes, erase the malware's tracks, alter data, or create system disruption. … Dr. Halderman has explained the many ways a BMD could be maliciously programed or otherwise malfunction such that the ballot printed by the BMD does not match the voter's intended selections." *Curling,* Dkt. 964 at 27-28, 67 (emphasis added).

and inconsistent with the cooperation between Plaintiffs' counsel and the counsel representing Dominion regarding Dr. Halderman's engagement by its senior employee.  Dominion cooperated with Plaintiffs when doing so served its own ends.  It otherwise has opted for obstruction and a head in the sand approach regarding the security of its equipment, which is highly improper.

The *Curling* record confirms that Plaintiffs are good-faith litigants seeking to protect their individual rights to vote using verifiable, accurate, secure, and transparent voting mechanisms. While courts are rightly sanctioning conspiracy theorists and their enablers for their misconduct and frivolous claims, *e.g., O'Rourke v. Dominion Voting Systems, Inc.,* No. 20-CV-03747-NRN, 2021 WL 3400671 (D. Colo. Aug. 3, 2021), Plaintiffs obtained an injunction in the *Curling* action in a 147-page order concerning Georgia's Dominion voting system, concluding:

> Plaintiffs' challenge to the State of Georgia's new ballot marking device QR barcode-based computer voting system and its scanner and associated software presents serious system security vulnerability and operational issues that may place Plaintiffs and other voters at risk of deprivation of their fundamental right to cast an effective vote that is accurately counted.

*Curling*, Dkt. 964 at 143 (citation omitted).  This is the *second* injunction Plaintiffs have obtained in Georgia.  The first enjoined usage of Georgia's prior system as of 2020 because "the State's failure to remedy known security breaches and exposures compromising Georgia's electronic voting machines and election servers violates their Fourteenth Amendment substantive due process and equal protection rights."  *Curling,* Dkt. 579 at 130.[3]

Dominion's Response is riddled with contradictions and misleading claims that do not justify its refusal to comply with Plaintiffs' Subpoena.  For example:

---

[3] The prior election system was subject to unauthorized access multiple times, including in 2016, and the current election system uses some of the same components of the prior system.  Dominion equipment was first used in Georgia elections on a pilot basis in 2019 and throughout the State of Georgia in 2020.

- According to Dominion, Plaintiffs' Request No. 2 seeks highly sensitive trade secrets (Resp. 12) that Dominion also argues are already available to the public (Resp. 9)—these two claims cannot be reconciled.

- Dominion claims concern that it will have to collect documents from 60 or more custodians, but omits that it refused to confer with Plaintiffs to work out a reasonable, limited custodian list. Plaintiffs took (more than) reasonable steps to alleviate Dominion's claimed burden, but Dominion has steadfastly refused to avail itself of these opportunities, as it was required to do.

- Dominion expresses shock that Plaintiffs waited three weeks to file this Motion, but omits that Plaintiffs spent those three weeks trying to meet and confer with Dominion (Mot. 1-2, 6), having first sought discovery from State Defendants and having continued to seek discovery from county election authorities and other non-parties (whom Plaintiffs understand Dominion has separately directed not to cooperate with Plaintiffs' lawful discovery efforts).

Discovery from non-parties is customary, and Plaintiffs' Subpoena is appropriate and proportional to the needs of the case. Dominion is not some disinterested bystander here: Georgia awarded Dominion a $106 million contract for its voting equipment and likely has paid Dominion even more for maintenance and support.[4] The court should order Dominion to provide the requested discovery immediately, and award Plaintiffs their fees and costs.

## ARGUMENT

In their Motion, Plaintiffs explained Dominion's persistent nonfeasance that led to this Court. Mot. 1-2. Dominion does not excuse its refusal to comply with its meet-and-confer duties. *See* D.C. Colo. L. Civ. R. 7.1. The Court should not reward Dominion's noncompliance by sustaining its improper objections to the Subpoena. Dominion's demand for costs for providing discovery from *three individual voters* of limited means (counsel represents them *pro*

---

[4] Aaron Diamant, *Secretary of State announces new $106M voting machine contract*, WSB-TV 2 (July 29, 2019), https://www.wsbtv.com/news/local/secretary-of-state-unveils-new-voting-machines/970920714/.

*bono*) is remarkably brazen and harsh, and an apparent effort to bully them into withdrawing the Subpoena for fear of financial hardship or ruin.  Dominion's objections fail.

**A.      Dominion Fails to Meet Its Burden to Establish that Plaintiffs' Seek Information that is Irrelevant, Disproportional, or Otherwise Proscribed by Rule 45**

The scope of non-party discovery under "Rule 45 is the same as set forth in Rule 26(b)(1)" – relevant information in the possession, custody, or control of non-parties and that is proportional to the needs of the case.[5]  Plaintiffs served reasonably-narrow Requests focused on important information needed from Dominion that meet all requirements of Rules 45 and 26.

*1. Relevance.* Dominion claims that it is "unclear how its communications are relevant to [Plaintiffs'] claims in *Curling*."  Resp. 11.  This is nonsensical.  The *Curling* court previously concluded based on the lengthy evidentiary record before it that "Dominion plays a large role in all dimensions of the implementation of the new voting system in partnership with the Secretary of State's Office."  *Curling,* Dkt. 946 at 15.  Dominion and its senior employee Dr. Coomer have each directly participated in the *Curling* case, including live testimony from Dr. Coomer presented by certain of the Curling Defendants.  Mot. 9-10.  Last fall Plaintiffs also obtained from Dominion important communications with State Defendants and their agents— communications State Defendants did not produce themselves and that proved highly relevant.[6]

---

[5] *Premier Election Sols., Inc. v. Systest Labs Inc.*, No. 09-CV-1822-WDM–KMT, 2009 WL 3075597, at *2 (D. Colo. Sept. 22, 2009) (citing Fed. R. Civ. P. 45 Adv. Comm. Note (1970)).

[6] Dominion looks to open records processes as a substitute for discovery, ignoring that many of the documents requested are not public, which Dominion itself argues incoherently.  For those that may be, Georgia's Secretary of State has resisted open records requests for some time.  *E.g.,* Am. Oversight, *Georgia's Secretary Of State Releases Records In Response To American Oversight's Lawsuit* (Oct. 24, 2020), https://www.americanoversight.org/georgias-secretary-of-state-releases-records-in-response-to-american-oversights-lawsuit.  Dominion does not explain in its Response the inherent tension between insisting that much of the discovery Plaintiffs seek is public record, but also highly confidential, trade secret, and/or subject to attorney-client privilege.  In any event, Plaintiffs have made open records act requests under Georgia law for years, but Defendants have inhibited and delayed these efforts.

For example, one such email crucially-revealed that the employee responsible for providing counties with instructions on testing and securing election equipment and data had advised Dominion technical workers for counties that they could re-use old USB drives that were used to transfer data in the previous election system, which the court had enjoined a year earlier as unconstitutional because it had been compromised multiple times. *See Curling,* Dkt. 892-11 (produced by Dominion) (with other exhibits produced by Dominion attached hereto as **Omnibus Exhibit 8**); *see also Curling,* Dkt. 946 at 19 (Plaintiffs' evidence shows ballot selections "are subject to being accessed and manipulated through hacking, unauthorized intrusion … by USB flash drives" among other means). The discovery sought here is highly relevant to the security of Georgia's election system, and to the verifiability and auditability of votes cast in its elections. This is apparent on the face of the Requests. Mot. Ex. 2, Nos. 8-17.

*2. Proportionality.* Recognizing that proportionality cannot be credibly disputed, Dominion dedicates a single paragraph to this factor. Resp. 12. While it italicizes the (modest) number of requests for emails and complains that the parties have not agreed on a reasonable list of custodians – omitting that this is because Dominion refused to discuss the Requests – Dominion undertakes none of the analysis required to show disproportionality. It must establish that the information sought is not proportional to the needs of the case "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Hildebrand v. Wilmar Corp.*, No. 19-CV-00067-RM-NRN, 2020 WL 6262999, at *1 (D. Colo. May 22, 2020) (quoting Fed. R. Civ. P. 26(b)(1)).

The importance of the issues at stake cannot be overstated. "It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, and to have their votes counted. *Other rights, even the most basic, are illusory if the right to vote is undermined.*" *Reynolds v. Sims*, 377 U.S. 533 (1964) (citations omitted) (emphasis added). The requested discovery is highly relevant to the core of Plaintiffs' claims: "[T]he Constitution affords Plaintiffs an interest in transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote." *Curling,* Dkt. 964 at 78. Likewise, the *Curling* court has already recognized "Dominion's own historic unwillingness to provide independent cybersecurity researchers with access to the Dominion Suite software and equipment package (through sale or otherwise)," despite finding that "[t]he substantial risks and long-run threats posed by Georgia's BMD system, at least as currently configured and implemented, are evident." *Id.* at 85-88. The discovery sought is highly important.[7]

*3. Possession, Custody, and Control.* Dominion argues that Plaintiffs' Request No. 1, which requests a "forensic image" of a certain Dominion server, seeks information outside of Dominion's possession (though it is within its control) because the Request requires Dominion to generate a document not typically created in the normal course of its business activities. Resp. 7. This Request, however, is reasonable and permitted. Plaintiffs sought to *reduce* the burden on Dominion by requesting a server *image* rather than requesting access to inspect the server. Courts have endorsed such practical measures, even when compliance with the request technically requires the creation of a document not typically generated in the ordinary course of business. *See, e.g., Apple Inc. v. Samsung Elecs. Co. Ltd.*, 2013 WL 4426512 (N.D. Cal. Aug.

---

[7] *See also* Section C *infra.*

14, 2013) (requiring non-party to query a large database and produce resulting report over non-party's objection that it should not have to create new documents); *Gonzalez v. Google*, Inc., 234 F.R.D. 674 (N.D. Cal. 2006) (same).  Plaintiffs' experts would be happy to create the forensic image themselves with access to the server, which Dominion can coordinate given its own access to the relevant server.

Though Dominion's objection to Request No. 7 is unclear, it seems to object because a version of the requested software is still being developed and may not ultimately be used in Georgia.  Resp. 8.  Whether classified as a "possession, custody, or control" objection, a relevance objection, or something else, the objection fails.[8]  Plaintiffs seek a copy of Dominion software (and necessary ancillary information) that enables voting by paper ballot without using a bar or QR code for tabulation.  *See* Mot. Ex. 2, No. 7.  Such software is relevant to Plaintiffs' claims, and Dr. Halderman's findings, that vote tabulation by a bar or QR code is unnecessary and highly unreliable (*see, e.g.,* Resp. Ex. B, Third Amended Complaint ¶¶ 62-90).

**B.      Dominion Fails to Establish That Any Burden is Undue`**

The Response's repetition of Dominion's boilerplate burden objections does not remedy the deficiencies the Motion identified.  "When the burdensomeness of a subpoena is at issue, the onus is on the party who alleges the burden to establish the burden with specificity," and courts require information such as "how many documents are responsive to the subpoena, how those documents are stored, how many of those documents are privileged or protected, or how much it would cost to" collect, review, and produce.  Mot. 7-8 (citing *Veroblue Farms USA, Inc. v. Wulf*, No. 1:21-MC-00016-CMA, 2021 WL 1979047, at *2 (D. Colo. May 18, 2021)).  Dominion

---

[8] The *Curling* protective order resolves any confidentiality objection. *See* Section D *infra.*

acknowledges this burden of proof (Resp. 13-14 (citing Ex. A ¶¶ 15-19)), but fails to meet it. Dominion's primary excuse for doing so—that it has not had enough time to determine the actual burden—fails.  Dominion claims that it had only two weeks to determine the purported burden, but *Dominion received the Subpoena more than two months ago*, on June 10, 2021.  If Dominion were taking its duties seriously, it would have completed that process well before Plaintiffs filed this Motion.  It is worth noting that Dominion had no trouble producing months of communications with the Georgia Secretary of State's Office on an expedited basis a year ago.

Dominion also misstates the purported burden it would have faced from complying with the Subpoena.  It claims that compliance with Request Nos. 8-17 "would require [Dominion] to gather communications from over 60 relevant custodians."  Resp. 13.  And it complains that many of the Requests "lack a relevant time limitation."  Resp. 13.  The parties could have readily limited the custodians and relevant time period for specific Requests weeks ago had Dominion complied with its meet-and-confer duties.  *See, e.g.,* Mot. 6.  Having deliberately, and repeatedly, forfeited that opportunity, it should not now be heard to complain.

Dominion's authorities do not support its position.  For example, it cites *Western Convenience Stores, Inc. v. Suncor Energy (U.S.A.) Inc.* for the uncontroversial proposition that courts protect non-parties from *undue* burden.  *See* Resp. 5 (citing No. 11-CV-01611-MSK-CBS, 2014 WL 1257762, at *6 (D. Colo. Mar. 27, 2014)).  That case concerned a non-party's request for reimbursement of the costs of producing documents.  In largely *denying* that request, the court explained that, while "the court should be especially vigilant to protect the non-party from undue burden and expense … this principle should not be invoked to excuse the non-party's own

evasive or obstructive conduct." *Id.* at *25. The same logic holds here.[9] Dominion's burden

objections are misplaced, unsubstantiated, and untimely.

**C.     Dominion Fails to Meet Its Burden to Establish that the Requested Information Is Available from Other Sources**

Dominion's repeated claim that the information sought can be obtained from the *Curling*

Defendants is incorrect and unsupported. Because Dominion has provided "no evidence" that

Plaintiffs will receive the requested discovery from the *Curling* Defendants or even that they

have it, this objection fails. *Infinity Home Collection v. Coleman*, No. 17-MC-00200-MSK-

MEH, 2018 WL 1733262, at *4 (D. Colo. Apr. 10, 2018).

Additionally, as detailed in the Motion and described in Section A *supra,* Plaintiffs seek

documents and materials unique to Dominion or important to receive directly from Dominion.

Moreover, Dominion omits that it has advised others not to turn over responsive documents that

Dominion treats as confidential in response to a subpoena. *See* July 6, 2021 M. Maguire Letter

to B. English (attached hereto as **Exhibit 9**).[10] Dominion's sudden self-serving claim that it

---

[9] The Court in *Western Convenience Stores* also *denied* the non-party's motion to quash the document subpoena, as (i) the non-party "had not sustained its burden to show that a search for responsive information would be unreasonably burdensome or expensive," *id*. at *10, and (ii) the court found that, "[g]iven the broad discovery permitted under Rule 26(b)(1)," the plaintiffs' requests to the non-party were appropriate, notwithstanding "the breadth of [the] original subpoena, or the fact that Plaintiffs sought information that was in some respects duplicative of materials produced by [defendant]," *id*. at *22.

[10] Plaintiffs' claims in *Curling* regarding Dominion's voting equipment and the need for discovery from Dominion are even more important and time-sensitive given recent events. Just this week, images of Dominion's election management system servers (which it claims are confidential) reportedly were publicly distributed. These purport to be authentic copies from those with access to the necessary equipment, and thus — if true — could provide a road map to how similar EMS servers in Georgia are configured and operate, exacerbating already extreme vulnerabilities with Georgia's Dominion voting system. *See* AJ Vicens, *QAnon Hero Claims to Present Sensitive Election Files at MyPillow CEO Event*, MotherJones (Aug. 11, 2021), https://www.motherjones.com/politics/2021/08/qanon-hero-claims-to-present-sensitive-election-files-at-mypillow-ceo-event/. To be clear, Plaintiffs do not endorse improper disclosure of confidential election software, if that is indeed what occurred here, and there have been no such leaks in the *Curling* litigation (Plaintiffs themselves designated Dr. Halderman's report "Attorneys' Eyes Only" per the *Curling* protective order).

would now "be happy to consider a request to consent to certain discovery served on the *Curling*

defendants" (Resp. 10), is empty and far too late.

**D.      Dominion Fails to Meet Its Burden to Establish that the *Curling* Protective Order Is Insufficient to Protect Any Confidential Information**

Dominion makes no effort to address Plaintiffs' rebuttals to its misplaced "trade secrets"

objections.  Dominion cites no breaches of the *Curling* court's longstanding protective order.

And far from seeking to disclose information to unnamed "competitors" (Resp. 12), Plaintiffs are

simply three individual voters seeking to protect their individual rights to vote.  No party in the

*Curling* case is a competitor to Dominion or even remotely close.  Nevertheless, Dominion

expresses vague, unsupported "concerns" about whether Plaintiffs will comply with the

Protective Order.  Resp. 13.  These "concerns" are meritless and not well taken.

Here, Dominion has previously invoked the appropriateness of the *Curling* protective

order.  *See* Mot. 11.  When, *like here*, appropriate protections are in place, objections based on

confidential information or trade secrets fail.  *See* Mot. 11-12 (collecting cases); *see also W.*

*Convenience Stores*, 2014 WL 1257762, at *7 (admonishing non-party for "continu[ing] to raise

the 'protective order' issue as an excuse for its non-compliance").

**E.      Dominion's Arguments regarding Standing and Discovery Disputes in Georgia Are an Irrelevant Distraction**

Despite Plaintiffs having explained to Dominion the status of the standing issue and

discovery in the *Curling* case, Dominion misstates the status of that case.  As explained in the

Motion, and as Dominion's Response fails to recognize, the *Curling* court repeatedly denied

motions to dismiss Plaintiffs' case for lack of standing.  *Curling*, Dkt. 375 (May 21, 2019), Dkt.

751 (July 30, 2020).  Moreover, the *Curling* court repeatedly has made clear that it will revisit

Defendants' standing defense at summary judgment *after discovery is completed*, including non-party discovery, which is expressly intended to provide Plaintiffs an opportunity to rebut Defendants' standing defense (and others) with a fulsome record.  *See* Mot. 14.  Dominion cites no case where a court denied *non-party discovery* upon a finding that the party seeking discovery *for another litigation before another court* lacked standing to bring the claims in that underlying case (especially after the court hearing those claims already rejected the standing arguments multiple times).  Standing is not an issue for determination by a court whose jurisdiction arises from enforcement of a non-party subpoena for discovery for a matter before another court, especially in an entirely different jurisdiction.  Dominion itself insisted on *this Court* deciding the discovery dispute regarding the Subpoena rather than the *Curling* court.  Whether this was an attempted end-run around the *Curling* court's decisions on standing and discovery, that court was—and is—the one to which to address any standing arguments.

Similarly, Dominion fails to cite any authority for its claim that discovery disputes between the parties in Georgia somehow absolve Dominion of its discovery duties.  If anything, those discovery disputes only underscore the immense difficulties Plaintiffs face in obtaining discovery from the *Curling* Defendants—a fact the *Curling* court has lamented many times.[11]

---

[11] *See, e.g., Curling,* Dkt. 969 at 4 ("Defendants' … portrayal of the record evidence and the Court's findings paint a picture of this case that is unrecognizable.  This includes the nature of the allegations in the pleadings, the scope and timing of discovery, the delay caused by Defendants' appeal of the Court's threshold jurisdiction over claims that was essentially deemed to be frivolous by the Court of Appeals.  Despite the delays in the case as a result of the Defendants' aggressive litigation strategy and motions practice, the Plaintiffs and the Court attempted to facilitate the factual development in a timely manner because of the expedited relief sought in connection with a continuing cycle of elections.  Plaintiffs conducted an enormous amount of discovery and evidence gathering to support their claims.  Defendants meanwhile made strategic decisions to limit their discovery, choosing not to conduct any fact or expert depositions."); *Curling,* Dkt. 957 at 2 ("While State Defendants have provided some information in response to the Court's directive, it has been either confusing, incorrect, or misleading …. Murkiness is not what the Court expected after its efforts at directing clear communications in two different phone

Still worse, Dominion repeatedly draws connections between Plaintiffs' long-running lawsuit and baseless efforts at reversing lawful election outcomes or destabilizing confidence in future elections through meritless litigation or "public audits".  Resp. 2-3, 14-17.  Even a cursory review of the Subpoena and the history of the *Curling* case compellingly refutes any notion that the Subpoena is an attempt to legitimize any of these efforts, Maricopa County included. Dominion's argument otherwise is not only offensive but bad faith given its recognition of the credibility and expertise of Plaintiffs' expert, Dr. Halderman, through its approval of its senior employee's retention of Dr. Halderman for defamation litigation against the same conspiracy theorists Dominion likens him and Plaintiffs to here.

Plaintiffs and their counsel are not Lin Wood or Rudolph Giuliani, or the recently-sanctioned Colorado lawyers in *O'Rourke*.  Plaintiffs' claims are different, their injuries are different, and their motives are vastly different.  *See* Mot. 13-14 (citing *Curling,* Dkts. 1067, 1075).  Dominion's repeated claim to the contrary is borderline sanctionable itself.

## F.    Cost-Shifting Is Highly Inappropriate and the Request Is Wholly Improper Here

Dominion should be required to bear its own costs in responding to Plaintiffs' Subpoena. In determining whether to shift expenses to the requesting party, courts look to various factors. The huge disparity in the parties' respective abilities to bear the cost and the public importance of the litigation weigh heavily against requiring Plaintiffs to bear Dominion's costs.  Dominion is a large corporation that earns hundreds of millions of dollars in revenue—*including specifically*

---

conferences during the week of September 28th.  This type of cat and mouse response over the last ten days regarding a time sensitive significant matter has needlessly burdened the Court.").

*from the election system it sold to and maintains for the State of Georgia.*[12]

By contrast, the requesting parties here are three individual voters of limited means represented by counsel on a *pro bono* basis (counsel already has incurred millions of dollars in fees and costs obtaining the 2019 injunction and pursuing similar relief for the current voting system). As the *Curling* court recognized, these voters seek to protect "their fundamental right to cast an effective vote that is accurately counted." *Curling*, Dkt. 964 at 143. The claimed cost of $45,000 amounts to a rounding error relative to Dominion's revenues *just from Georgia alone*. Dominion may hope the brazenness of the threat is enough to scare Plaintiffs into withdrawing their Subpoena. Further, requiring Plaintiffs to pay for discovery from Dominion would all but guarantee that no voters would (or could) pursue such critical discovery in other legitimate election cases in the future—which may well be part of Dominion's intent.

Dominion's citation to *Rhea v. Apache Corp.*, 833 F. App'x 186 (10th Cir. 2020) is misplaced. In *Rhea*, a class action plaintiff sought discovery from a non-party operator of natural gas gathering systems that, according to at least three affidavits from the operator, would have "involved at least thirty-six different, and some obsolete, computer systems, required hiring approximately twenty-four analysts/experts, and taken over 900 work days to complete" at an estimated cost of (at least) $330,000. 833 F. App'x at 188-89 (cleaned up). Here, Dominion's representative estimates that complying with the Subpoena in full (*having declined to confer about any of the Requests*) would cost $45,000 plus attorneys' fees (and some vague, undefined

---

[12] *See* University of Pennsylvania, Wharton School Public Policy Initiative, *The Business of Voting: Market Structure and Innovation in the Election Technology Industry*, at 24 (July 26, 2018), https://web.archive.org/web/20200701025059/https://publicpolicy.wharton.upenn.edu/live/files/270-the-business-of-votin.

"lost opportunity costs" that are not recoverable under Rule 45). Resp. Ex. A ¶ 18. Having been entrusted with providing secure, reliable voting equipment for elections in Georgia and elsewhere, $45,000 is a truly nominal cost to Dominion to provide basic information needed to protect the right to vote using *its own* highly-lucrative voting equipment.[13]

## **CONCLUSION**

The Court should order Dominion to produce within ten days of its Order the information sought in Plaintiffs' June 9 Subpoena and to pay Plaintiffs their reasonable attorneys' fees and expenses incurred in connection with this Motion, which Dominion needlessly required.[14]

Dated: August 13, 2021                    Respectfully submitted,

                                          _/s/ David D. Cross_____
                                          David D. Cross
                                          Mary G. Kaiser
                                          MORRISON & FOERSTER LLP
                                          2100 L Street, NW
                                          Washington, DC 20037
                                          Telephone: (202) 887-1500
                                          DCross@mofo.com
                                          MKaiser@mofo.com
                                          *Counsel for Plaintiffs Donna Curling, Donna*
                                          *Price & Jeffrey Schoenberg*

---

[13] To the extent the Court entertains Dominion's concerns that compliance with the Subpoena will result in "significant expense," the Court has the ability to "fix the costs in advance of production … to protect the party seeking discovery from excessive costs" and to render the remainder of discovery costs non-significant, which Plaintiffs submit is fitting in light of the considerations described herein. *See* Fed. R. Civ. P. 45 Adv. Comm. Note (1991) (cited in *Rhea*, 833 F. App'x at 190-91).

[14] Plaintiffs note that Dominion's filing (Dkt. 10) seeking to excuse its failure to respond to the Motion by the original deadline was materially misleading in its omissions and characterizations. For example, Plaintiffs did not send the Motion to some random Dominion counsel in Georgia having nothing to do with the Subpoena as Dominion's filing implies; rather, that counsel has represented Dominion throughout the *Curling* case, including appearing in that case multiple times and, more specifically, for the purpose of Plaintiffs' efforts to try to negotiate Dominion's compliance with the Subpoena at issue here. Ex. 9. Dominion's counsel never indicated that email service was not sufficient for the Motion, despite past practice. Dominion did not amend its filing after Plaintiffs noted their concerns.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this 13th day of August, 2021, filed the within and foregoing ***Reply in Support of Plaintiffs' Motion to Compel Discovery from Non-Party Dominion Voting Systems, Inc.*** with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ David D. Cross*
David D. Cross
